### TRADERS & GENERAL INS. CO. v. JONES et al.

#### No. 14344.

Court of Civil Appeals of Texas. Fort Worth.

March 13, 1942.

Rehearing Denied April 10, 1942.

Lightfoot, Robertson & Gano, of Fort Worth, for appellant.

Lindsley M. Brown, of Arlington, and Clark, Craik, Burns & Weddell, of Fort Worth, for appellees.

McDONALD, Chief Justice.

This is the second appeal of this case. The nature of the suit, in which a widow and child seek recovery under the Workmen's Compensation Laws, Vernon's Ann. Civ.St. Art. 8306 et seq., for the death of the husband and father, is fully set out in the former opinion of this court. Jones v. Traders & General Ins. Co., Tex.Civ. App., 144 S.W.2d 689.

The parties will be designated as they were in the trial court.

Briefly stated, the deceased received an injury from a nail or other sharp object in the bottom of his foot, in May of 1938. On November 11th of the same year he drank a poisonous mixture of concentrated lye, cleaning fluid and insect powder, and died three days later. Reference is made to the former opinion of this court for the substance of plaintiffs' pleadings. In effect, they allege that Jones' injuries caused him

to become mentally deranged to the extent that he took his own life, and that, hence, his death is compensable. On the former appeal it was held that the petition was sufficient to state a cause of action. The question on this appeal, among others, is whether the evidence is sufficient to prove the cause of action alleged. The following, taken from plaintiffs' brief, presents their theory of the case proved: "While it is true that the plaintiffs in certain portions of their petition did allege that the deceased had become mentally deranged by reason of infections which had spread from the injury to other parts of his body, including his brain, the real theory of recovery as plead and proved was that Tom P. Jones had taken his life while in a delirium or frenzy brought on by the present pain and suffering from his injuries, and for such reason there was a direct causal connection between his injuries and death, and further, that his act was not wilful or intentional so as to deprive his beneficiaries of compensation. Under the law, as announced by the Honorable Court upon the prior appeal, this theory, if established, would support a recovery, regardless of whether the deceased had become permanently insane, and irrespective of whether infections spread from the injury to other portions of his body. In other words, if the deceased by reason of unbearable pain resulting from his injuries, was seized with an uncontrollable impulse to take his life, his death is compensable under the Act. The case was tried and submitted to the jury upon that theory and the jury found the facts to exist as plead."

The jury found that the injury received by Jones was the producing cause of his death; that the injury resulted in Jones becoming mentally unbalanced, to the extent that he did not understand the consequence of his act in taking his own life; and that such mental condition was the producing cause of his death.

The defendant moved for an instructed verdict, and later for judgment non obstante veredicto. The trial court rendered judgment on the verdict for plaintiffs.

The following is taken from plaintiffs' brief as their summary of the testimony of the widow, Mrs. Lucille Jones, and of Dr. Collins, who appeared as a witness for plaintiffs:

"The plaintiff, Lucille Jones, testified that the deceased sustained his injury on May 4, 1938 (Wednesday), and when he came home that week end, his foot was red and swollen to above the ankle and was bandaged; that he never worked again, was compelled to remain in bed and take medicine to relieve the pain in his foot; that he went to his doctor three times each week, used crutches, and was unable to wear a shoe; that his doctors operated on the deceased's foot five times; that Jones had always been in good health previously, had never been sick and had always been in good spirits; that his weight dropped from 160 to 138 pounds before he died; that the deceased was never able to sleep or rest without medicine, being highly nervous day and night, constantly complaining about the pain in his foot, and never seemed like the same person again; that milder sedatives, such as aspirin and anacin would not ease his pain, and his doctors gave him stronger medicines in the form of capsules; that the same condition continued until he was taken to the hospital on November 11th, 1938; that he left a note telling his wife he had taken the poison; that he had slept none the night before, and she had been up with him all night; that he tried to get out of the house, and each time he touched his foot on the floor he cried out with pain; on the day following, when his wife returned from watering the chickens, she found him on the bed doubled up with pain and foam coming from his mouth; the deceased handed her a note saying, 'Look in book for note, my foot hurts me so bad;' when the witness ascertained that he had taken lye and other poisons, she poured vinegar down him and called Dr. Collins, who had him removed to the hospital; the deceased had taken a mixture of concentrated lye, cleaning fluid and insect poison; that she and the deceased had no trouble of any kind and there had been no indication of insanity in the deceased or his family; that Jones had always been a hard worker; that the wound in his foot drained poorly, necessitating many trips to his doctor; that the wound seemed to heal along in September of 1938, at least on the outside, but seemed to have pus on the inside; with the exception of trips to his doctor, Jones left Arlington only once from the time of his injury until he was taken to the hospital just before his death; that he tried to borrow a gun from his nephew on the day he took the poison; the first words he spoke after taking the poison were 'Honey, I'm gone'; that she asked him

at the hospital why he had taken the poison, and he told her that his foot hurt so that he could not stand it any longer; that she had no trouble with the deceased, and his children by a former marriage visited them, and still come to visit with her; that the defendant paid the deceased some compensation before he died; that the witness saw two of the deceased's weekly pay checks shortly before he died, one being for $35.00 and the other for $30.00; that his employer also furnished him with board and room in addition to his wages; that he was paid compensation at the rate of $13.85 per week; that she saw no pay checks for less than $30.00 and that $7.00 would be a reasonable charge for the board and room furnished him by his employer; that the witness stayed at the hospital all of the time until her husband's death; that he did not talk to the other patients, and talked to her only with extreme difficulty; that his children by former marriage came to visit him in the hospital; that the eight pill boxes identified by her contained prescriptions, given by Dr. Ross Trigg, for medicine to relieve pain and the instructions so stated on the boxes; that some of the boxes had been refilled several times.

"Dr. J. B. Collins testified that he was City Health Officer of Arlington, Texas, and waited upon the deceased for a period of three or four months prior to his death; that the deceased's foot showed a scar and swelling and the ball of his foot had wasted away to the extent that he had no pad of flesh left; that he prescribed sodium-amytal for Jones, from August until he died, to relieve his pain; that his condition seemed to get worse rather than better; that Jones complained of constant pain in his foot and claimed he could not sleep; that he concluded that there was an impingement of the nerves in Jones's foot as being the only explanation of the continuous pain he suffered; that he was not able to walk and that the injury was in a place that made it unusually painful; that Jones seemed to be in constant pain and always seemed to be nervous and depressed, and that the ball of his foot was partially destroyed; that constant pain such as Jones suffered tends to make one desperate; that when he was called after Jones had taken the poison, he asked the deceased, 'What on earth made you take that, Tom?' and that Jones replied, 'To get out of this pain, I will do anything to get easy;'

that in his opinion, the intense pain with which Jones was suffering, coupled with his loss of sleep, temporarily destroyed his sense of reason; that the intense pain was the cause of his derangement; that he could account for the intense pain only upon the theory that the nerves were impinged; that there was a swelling after the wound seemed to be healed on the outside; that Jones would come to him upset and nervous, and the witness would give him something to quiet him, and would instruct him to go to bed; that the deceased was in shock and calm after taking the poison; that in the opinion of the witness as a doctor, Jones would not have taken the poison had he known what he was doing; that the purpose of the deceased in taking the poison was to ease his pain; that impinged nerves cause intense pain and it seemed to be the general opinion at the autopsy that the deceased suffered such a condition, although that affliction did not definitely appear from the autopsy; that strong narcotics did not seem to relieve the pain with which the deceased suffered; that the infection from the injury would enter the blood stream and go over the deceased's entire body."

The above summary by plaintiffs is supported by the evidence shown in the statement of facts, except to the extent we shall note herein, ahd is as favorable to plaintiffs as the record warrants.

The opinion on the former appeal adopts, as the rule applicable to the case, the following statement from 71 Corpus Juris, 638, summarizing the holdings of Courts of other states: "Provided the insanity results from a compensable accident and not from a brooding over the injury or other causes, the suicide of an employee while insane may entitle his dependents to compensation therefor; thus, where there follows as a direct result of the accident an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death, there is a direct and unbroken causal connection between the physical injury and the death; however, where the suicide is the result of voluntary and willful choice determined by a moderately intelligent mental power with knowledge of the purpose and effect of the act, even though dominated by a disordered mind, a new and independent agency breaks the chain of causation."

Mrs. Jones testified in some detail concerning the actions of her husband on the day he drank the poisonous solution. According to her testimony, he first went over to the home of a nephew, and endeavored to borrow a gun. Mrs. Jones, on that morning, was washing and making soap, using concentrated lye in making the soap. During the morning her husband said to her: "Don't make up that other can of lye. I don't want you to. I want you to come in the house. I don't want you out there any more." Mrs. Jones testified that she did not know at that time what he had in mind. She had not used one of the cans of lye. After she got through making the soap she went to the house of a neighbor, and returned shortly thereafter. Jones was then going into the house and said to his wife: "Have you watered the chickens?" She answered that she had not; whereupon he said: "Well, you go water them." She replied, "No, not now." He said, "Yes." She then watered the chickens, and when she came back found Jones lying on the bed. While she had gone to water the chickens, Jones had drunk the poisonous solution. He stated to her: "Honey, I'm gone", and gave her the note which is referred to in the above summary of Mrs. Jones' testimony.

On another page of the little notebook which he gave her was written the following: "Look on jug at gate on left from here for red cleaning fluid in can lye in baking powder can, 3 mix."

Although Mrs. Jones' testimony shows that her husband was nervous and restless, and that he suffered continually from pain, there is no evidence of probative value showing any acts, words or deeds of her husband on the day he took the poison which could be considered as those of an irrational or disordered mind, unless we accept Dr. Collins' theory that anyone who commits suicide must be mentally deranged. The courts have not accepted such theory. Mrs. Jones' testimony fails to show that Mr. Jones was in any state of excitement, or delirium or frenzy, at any time during the morning in question. There is no testimony to show that he did or said anything so out of the ordinary as to attract her notice. Her testimony reflects that his actions were calm and deliberate, rather than frenzied or delirious.

In the above summary of Dr. Collins' testimony it is recited that in his opinion the intense pain with which Jones was suffering, coupled with his loss of sleep, temporarily destroyed his sense of reason, and that the intense pain was the cause of his derangement, and also that Jones would not have taken the poison had he known what he was doing. But Dr. Collins' testimony must be examined as a whole, in order to give true effect to it. We think that his testimony as a whole reflects without dispute that Dr. Collins' opinion of Jones' mental derangement was based solely and only upon Dr. Collins' general opinion that any person who commits suicide is mentally deranged. We quote the following excerpts in the question and answer form in which they appear in the statement of facts:

"Q. (By plaintiffs' counsel) Doctor, knowing him and knowing the treatment and taking care of him there, state whether or not in your opinion, at the time he took this poison, he was mentally deranged. A. Well, I have concluded that any man that would commit suicide is off-balance.

"* * *

"Q. (By defendant's counsel) Doctor, in your opinion, from your examination of Mr. Jones out there the day you were called out and after he had taken this poison, was he in such mental condition that he knew what he was doing when he took it? A. I don't know.

"Q. Didn't he talk to you and tell you about it and explain it? A. That is after he took it?

"Q. Yes. A. I don't know what his condition was when he took it.

"Q. But didn't he show by his conversation that he knew what he had done? A. Yes."

After testifying that he did not think that Jones would have taken the solution if he had known what he was doing, the following question was asked:

"Q. I believe you made another statement awhile ago, something along a similar line: you said in your opinion he was mentally deranged at the time because any man who commits suicide is off-balance. That is about correct, isn't it? A. Yes, that is the statement I made awhile ago.

"* * *

"Q. (By plaintiffs' counsel) I believe it is your testimony that he was out of his mind when he did take it or before he took it? A. That is my opinion.

"Q. Your opinion. That is all."

The above answer was immediately followed by the following question by defendant's attorney:

"Q. Doctor, you do not testify that Mr. Jones at the time he took the lye wasn't rational, do you, because you don't know? A. No. I won't testify to that; that he was or wasn't.

"Q. And your conclusion that he was out of his mind, I believe is the expression Mr. Clark used, at the time he took it was simply because anybody who would take poison would be off-balance anyhow? A. That is the way I figure it. A rational person won't do it."

Although Dr. Collins testified that Jones complained a great deal about the pain in his foot, and was nervous, and appeared to be depressed, Dr. Collins did not testify concerning any word or act of Jones in his presence indicating any insanity or mental derangement. The most that can be said of Dr. Collins' testimony, construing it as favorably as possible to plaintiffs, is that Jones was nervous and depressed, that he suffered from the pain in his foot, that he was willing to do anything to obtain relief from the pain, and that he must have been mentally deranged because of Dr. Collins' belief that anyone who commits suicide is mentally deranged.

The testimony of two other witnesses appearing for plaintiffs was no more in substance than that Jones was well and healthy and a man of good spirits, before the accident, and that he was nervous and depressed afterward.

The other doctors who testified in the case appeared as witnesses for the defendant, and we are unable to find anything in their testimony which tends to support plaintiffs' claim that Jones was temporarily insane at the time he drank the poison.

The only possible theory which could be advanced under the proof adduced is that Jones was in a temporary frenzy or delirium on account of the pain he had suffered, at the time he drank the poison. There is utterly no evidence to support the allegations that the infection from the foot spread to other parts of the body and thus caused the mental derangement. In fact, we do not understand that the plaintiffs even contend that they have proven those allegations.

While it is probably a normal human reaction upon the part of plaintiffs to believe that Mr. Jones' act in taking his life could have resulted only from a disordered mind, and while the writer feels an emotional tendency to agree with Dr. Collins that any person who commits suicide must be mentally deranged, yet such a view is not in keeping with the authorities cited in Justice Dunklin's opinion. 144 S.W.2d 689. We are compelled to hold, regrettable as were the unfortunate circumstances involved, that the undisputed evidence shows that Mr. Jones purposely and intentionally drank the poisonous solution, that he knew what he was doing and that he knew and intended that the fatal effect should follow. Even though Mr. Jones considered that his pain was unbearable, and even though willing to depart this life in order to escape it, still there could be no recovery under our Workmen's Compensation Law if, to quote the Corpus Juris citation, "the suicide is the result of voluntary and willful choice determined by a moderately intelligent mental power with knowledge of the purpose and effect of the act, even though dominated by a disordered mind."

In addition to the authorities cited in the opinion of Justice Dunklin, on the former appeal, reference is made to the decisions cited in the annotation appearing in 56 A.L.R., beginning at page 459.

The first point of reversal relied upon by appellant is that a verdict should have been instructed in its favor, and the second point is that judgment should have been rendered for it non obstante. These points are sustained. This renders it unnecessary to discuss the other points relied upon.

The judgment of the trial court is reversed, and judgment is here rendered in favor of defendant, that plaintiffs take nothing by their suit.