LUCILLE JONES ET AL V. TRADERS & GENERAL INSURANCE
COMPANY.

No. 7992.  Decided February 17, 1943.
Rehearing overruled March 31, 1943.
(169 S. W., 2d Series, 160.)

*Clark, Craik, Burns & Weddell*, of Fort Worth, for petitioners.

It was error for the Court of Civil Appeals to hold that there was no evidence raising an issue of fact as to whether deceased was insane to the extent that he did not know or realize the nature and consequences of his acts at the time he drank the poison, or that he did not drink said poison with the wilful intent to injure himself, there being no evidence that he drank same for the purpose of destroying himself, but that he drank it to secure relief from the pain in his foot. Connecticut Mut. Life Ins. Co. v. Akens, 150 U. S. 468, 14 Sup. Ct. 155, 37 L. Ed. 1148; Eastabrook v. Union Mut. Life Ins. Co., 54 Me. 224, 89 Am. Dec. 743; 9 Wigmore on Evidence 2500; Traders Ins. Co. v. Carter, 94 S. W. (2d) 1221.

*Lightfoot, Robertson & Gano*, of Fort Worth, for respondent.

MR. PRESIDING JUDGE SMEDLEY delivered the opinion of the Commission of Appeals, Section B.

Tom P. Jones, an employee of a construction company insured by respondent, Traders & General Insurance Company, under the Workmen's Compensation Law, stepped on a nail which penetrated the ball of his foot, on May 4, 1938. The wound having become infected, it was necessary for Jones to have it treated, opened and drained a number of times during a period of several weeks. He suffered intense pain and on November 11, 1938, drank a mixture of concentrated lye, cleaning fluid and insect poison, which caused his death three days later. The suit is by petitioner, Lucille Jones, his widow, and Tom P. Jones, Jr., his minor son, as his legal beneficiaries, for the recovery of compensation under the provisions of the statute.

On the first trial the district court sustained a general demurrer to the petition and dismissed the suit, but that judgment was reversed by the Court of Civil Appeals and the cause remanded for trial. 144 S. W. (2d) 689. On the second trial, following a verdict favorable to petitioners, judgment was rendered in their favor against respondent for $6,019.54. The Court of Civil Appeals reversed that judgment and rendered judgment that petitioners take nothing by their suit, holding that the trial court should have instructed a verdict for respondent. 160 S. W. (2d) 569.

The theory of the case as presented by petitioners is that the employee took his life while in a delirium or frenzy, the result of constant and intense pain from his injury. The jury found in answer to special issues that the injury suffered by Tom P. Jones in the course of his employment was the producing cause of his death; that the injury caused Jones to become mentally unbalanced to the extent that he did not understand the consequences of his act in taking his own life; that such mental condition was the producing cause of his death; and that the taking of poison by Jones was not caused by his willful intention and attempted to injure himself.

■ The question for decision is whether there is any evidence of probative value to sustain the foregoing findings of the jury, all of which relate to the question of causal connection between the injury and the death.

The Court of Civil Appeals in both of its opinions adopted as applicable and controlling the following rule from 71 Corpus Juris, p. 638:

"Provided the insanity results from a compensable accident and not from a brooding over the injury or other causes, the suicide of an employee while insane may entitle his dependents to compensation therefor; thus, where there follows as a direct result of the accident an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death, there is a direct and unbroken causal connection between the physical injury and the death; however, where the suicide is the result of voluntary and willful choice determined by a moderately intelligent mental power with knowledge of the purpose and effect of the act, even though

dominated by a disordered mind, a new and independent agency breaks the chain of causation."

An annotation in 56 A. L. R., pp. 459-460, thus states substantially the same rule:

"Accordingly, when an accident under compensable circumstances ends in self-destruction, which is the result of uncontrollable impulse, or a delirium of frenzy, and without conscious volition to produce death, with knowledge of the physical consequences of the suicidal act, it has been held, even in the American cases, that there is a direct and unbroken causal connection between the accident and the death, and compensation therefore is to be awarded."

The texts quoted are well supported by the authorities cited and by the following later decisions: McFarland v. Department of Labor & Industries, 188 Wash. 357, 62 Pac. (2d) 714; Kazazean v. Segan, 14 N. J. Mis. 78, 182 Atl. 351; Ruschetti's Case (Mass.) 13 N. E. (2d) 34.

Compensation is awarded to the legal beneficiary of the deceased employee if death results from the injury. Article 8306, Section 8, Revised Civil Statutes of 1925. Causal connection must be established between the injury and the death. The injury must be the producing cause of the death, and producing cause has been defined as "that cause which, is a natural and continuous sequence, produces the death in issue and without which the death would not have occurred." Texas Employers' Ins. Ass'n. v. Burnett, 129 Texas 407, 410, 105 S. W. (2d) 200; Texas Indemnity Ins. Co. v. Staggs, 134 Texas 318, 134 S. W. (2d) 1026. In the Burnett case it was held that the injury was not the producing cause of the death, because the employee died as the result of typhoid fever which was in no way produced or caused by the injury, there being thus an independent intervening agency to which the death was directly due.

The question above made from Corpus Juris is the application to a case of death by suicide of the rule that controlled the decision of the Burnett case. Suicide is an independent agency that breaks the causal connection between the injury and the death if the mental condition of the victim, though disordered, is such that the suicide is the result of voluntary

and willful choice; but if the insanity is so violent as to cause him to take his life through uncontrollable impulse or in a delirium or frenzy, there is a direct and unbroken connection between the injury and the death.

There is evidence which at least tends to prove that the mental condition of Jones at the time when he took his life was the result of long suffering from the injured foot. The important inquiry is as to the extent of his derangement, or as to his mental power, at the time he killed himself. Is there evidence of frenzy or of uncontrollable impulse? The evidence most directly relevant to this inquiry is the testimony of petitioner, Mrs. Jones, together with that of Dr. Collins, who was called as a witness by petitioners.

The substance of the testimony of Mrs. Jones in so far as it relates to her husband's suffering and mental condition follows. When he came home his foot had a two inch gash in it, was swollen and very red. He did not go to work after that. He remained at home and in bed most of the time. He went to a doctor who operated or cut on his foot five different times. He visited the doctor's office many times and was able to "get about" on crutches but could not wear a shoe on the injured foot. Before his injury he was in perfect health and in good spirits. After the injury he was highly nervous and was never able to sleep without taking medicine. He was restless, would not talk to his friends and took no interest in his family. He expressed the belief that his foot would never get well. He lost about twenty pounds in weight. His appetite failed and during his last few days he lived on tomato juice and sweet milk. He never complained of pain except in his foot. His doctors gave him a number of prescriptions to relieve the pain from which he suffered night and day and he continued to take the opiates up to the time of his death.

On the night before November 11, the day on which her husband drank the poison, he did not sleep at all. She could not keep him in the house. "He was on his crutches and could barely touch his foot to the floor and just cry." The next morning she was making soap in the washhouse, using lye, of which she had three cans, when her husband came to her and told her not to use one of the cans of lye. He further said: "I want you to come in the house, I don't want you out there any more." At that time she did not know what he had in his mind. Thereafter he left home and went to his nephew's house. He returned

at about 11 o'clock, after she had finished making the soap. She then made a brief visit to a neighbor's house and on her return a short time after noon, he told her and urged her to go and give water to the chickens. She went to water the chickens and when she returned she found him lying on the bed. The only thing he said before he was taken to the hospital was: "Honey, I'm gone." She asked him: "What on earth have you done?" He said nothing in reply, but pulled a small notebook from his pocket and handed it to her. On the first page, in his handwriting, were these words: "Look in this book for note my foot hurts me so bad (Signed) Tom." On another page in the middle of the book, also written by him, was the following: "Look on jug at gate on left from here for red cleaning fluid in can lye in baking powder can, 3 mixed." She found at the place to which the note directed her a lye can, one-half of which was gone, and a baking powder can containing a mixture of lye, cleaning fluid and London purple. Her husband was taken to the hospital immediately and died there three days later. While he was in the hospital he said nothing to her except that on the night preceding the day on which he died he said: "My foot hurts me so bad I can't stand it any longer." The burns from the mixture he had swallowed were visible on the outside of his lips and on his chin. The only complaint that he made while in the hospital was of pain in his foot. About that he complained all of the time.

Dr. Collins, upon whose testimony petitioners primarily rely to prove that Jones was insane, testified as follows: Tom Jones came to him, complaining of his foot, on September 12, 1938. He found a scar and some swelling. "He could not walk on his foot like he should. It had no pad there. That muscle had sloughed off that way." The ball of the foot seemed to be partially destroyed. He treated Jones from that time until his death, giving him hot salt packs for a while, and after that seemed to do little good; he gave him sodium amytal to ease his pain. Jones became worse, complained of pain and seemed to worry a great deal. He never saw him when he was not complaining of pain. He has concluded that there was an impingement of the nerse, that "it was pinched in scar tissues somewhere there." Jones was very nervous and depressed all of the time. Constant pain over a long period causes a man to lose his sense of balance and become desperate.

In answer to the question: "Doctor, knowing him and knowing the treatment and taking care of him there, state whether

or not in your opinion, at the time he took the poison, he was mentally deranged" Dr. Collins said: "Well, I have concluded that any man that would commit suicide is off balance." Then follow these questions and answers:

"Q. Is it possible, Doctor, for a person to have such intense pain as to destroy his sense of reason?

"A. Yes.

"Q. In your opinion is that the situation in this case? Is that what happened at that time?

"A. Yes.

"Q. In your opinion, Doctor, what was the cause of his mental derangement?

"A. Intense suffering he had been going through with and loss of sleep.

"Q. Intense suffering from this injured foot?

"A. Yes."

On cross examination Dr. Collins testified that he had seen Jones in what appeared to be a state of mental frenzy and when asked to explain, he answered: "Well, any time he would come to me, he would come and talk to me, and sometimes get so nervous I would give him something to quiet him and send him home, tell him to go home and go to bed and stay there." He further testified:

"Q. In other words, Doctor, the evidence presented to you, in so far as you could see, was that he did know what he was doing when he took the poison, didn't he?

"A. No.

"Q. You don't think he knew?

"A. I don't think he would have took it if he knew what he was doing.

"Q. You don't think he would have taken it if he had known what he was doing?

"A. I don't think he would have taken it if he knew what he was doing.

"Q. And that is what you base your statement on?

"A. Yes.

"Q. I believe you made another statement awhile ago, something along a similar line: You said in your opinion he was mentally deranged at the time because any man who commits suicide is off balance. That is about correct, isn't it?

"A. Yes, that is the statement I made awhile ago.

"Q. As a matter of fact, hitting at all of us, you might say we are a little bit off balance.

"A. Yes, just a little bit."

After testifying on redirect examination that in his opinion Jones was "out of his mind" when he took the poison and before he took it, the doctor on recross examination stated that he did not testify that Jones was not rational when he took the poison, that he would not testify that he was or was not. Then in response to the question: "And your conclusion that he was out of his mind, I believe is the expression Mr. Clark used, at the time he took it, was simply because anybody who would take poison would be off balance anyhow? he answered: "That is the way I figure it. A rational person won't do it."

Dr. Collins testified that he was called when Jones took the poison, found him lying on the bed, and asked him what he had taken. He answered that it was mostly a concentration of lye and told him he took it "to get out of this pain. I will do anything to get easy." Jones was burned so badly that he could hardly breathe. He was not in a hysterical or frenzied condition. He told him what he had done, and what he said was "fairly rational." Dr. Collins testified further that the shock from taking the lye probably quieted his mental condition or brought back his rational mind. From what Jones told him, he "rather thought" that he took the poison for the purpose of killing himself and intended to do so.

Dr. Launey, who attended Jones after he was taken to the hospital and was called as a witness by petitioner, testified on cross examination that a person who suffers intense pain so that he cannot sleep, cannot eat and cannot sit, may become mentally deranged and commit suicide. His testimony is qualified by the expression of his opinion that no normal man will commit suicide and that intense pain suffered over a long period of time will not render a normal man mentally deranged.

■ We do not find in the testimony, the substance of which has been stated, or elsewhere in the record, evidence tending to prove a derangement or an insanity of such violence as to cause Jones to take his life through an uncontrollable impulse or without conscious volition. In our opinion the evidence conclusively proves that he drank the poison for the purpose of

taking his life and thus to put an end to his suffering, and that he did so deliberately, voluntarily and willfully.

Mrs. Jones was in a better position than any other person to observe and understand her husband's mental condition. She testified about his suffering, restlessness, moroseness, loss of appetite and inability to sleep, but nowhere in her testimony did she intimate that he was ever seriously irrational or that she had ever seen him in a delirium or frenzy. She was with him a very short time before he drank the poison, and his acts and words at that time, as she described them, were not those of one without conscious volition. He was deliberate and careful in planning the means of his self-destruction and in inducing Mrs. Jones to leave in order that he might prepare and drink the poison in her absence. After he had taken the poison he was rational, or "fairly rational."

Dr. Collins testified to his belief that Jones was insane or deranged or "out of his mind" at the time when he took the poison, but he expressed no opinion as to the extent of his derangement, that is, whether his insanity was of such violence as to destroy his power to act consciously and voluntarily. The doctor stated that he did not and would not testify that Jones was not rational at the time. It clearly appears from he testimony of Dr. Collins that he reached the conclusion that Jones was insane or "out of his mind" solely because of his belief that anyone who would commit suicide is "off balance." Such opinion is not expert opinion of probative value based on facts proven or assumed and relevant to the matter in issue. It is merely the expression of the belief of the witness, so general, speculative and conjectural in its nature that it could give no appreciable aid to the jury on the issues submitted to it. McCormick and Ray's Texas Law of Evidence, Sections 631-633, pp. 794-798; Ruschetti's Case (Mass.) 13 N. E. (2d) 34. The same is true of the opinion expressed by Dr. Launey, the substance of which has been given. Neither opinion is of aid in answering the particular inquiry on which the case turns, that is, the extent of the victim's derangement at the time when he drank the poison.

The argument is made in petitioner's briefs that, because the jury had the right to believe part of Dr. Collins' testimony and to disregard other portions of it and to reconcile inconsistencies in it, the court, in determining whether the opinion

given by him as to the sanity of Jones has probative force, must consider only the opinion as expressed by him on direct examination and disregard his adverse testimony on cross examination. The testimony of Dr. Collins on cross examination, which we have considered, is his explanation of the basis of the opinion that he expressed on direct examination. We have not undertaken to resolve inconsistencies in the testimony of the witness. His statement as to the basis of the opinion expressed by him on direct examination is not inconsistent with the opinion. It is explanatory of it. The explanation becomes part of the opinion. As said by the Court of Civil Appeals in its opinion in this case: "Dr. Collins' testimony must be examined as a whole in order to give true effect to it." 160 S. W. (2d) 569, 572. The court will look to all of the testimony of the witness to determine its legal sufficiency to support the jury's findings that are essential to petitioners' case. Gainesville Water Co. v. City of Gainesville, 103 Texas 394, 128 S. W. 370.

In Ruschetti's Case (Mass.) 13 N. E. (2d) 34, the facts as to the acts and mental condition of the employee a short time before he committed suicide by hanging himself are very similar to those in the instant case. A physician who qualified as an expert testified that in his opinion the employee was insane and that "the suicide was an act of unconscious volition resulting from an uncontrolled impulse of an insane man without conscious volition to produce death." The court, in a carefully considered opinion, after discussing the acts of the employee on the day of his death, and observing that nothing suggestive of frenzy or utter want of self-control appeared beyond the mere fact of suicide, held that, notwithstanding the physician's opinion, there was no evidence to warrant the finding of the Industrial Accident Board that death resulted from the injury.

After a careful examination of all of the evidence in the statement of facts, we approve the conclusion of the Court of Civil Appeals, which is thoroughly supported by its opinion, that the trial court should have instructed a verdict for respondent.

The judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court February 17, 1943.

Rehearing overruled March 31, 1943.