BLANCHE P. PAINTER, WIDOW, TOLVIN EDGAR PAINTER, DECEASED, AND BLANCHE P. PAINTER, ADMINISTRATRIX OF THE ESTATE OF TOLVIN EDGAR PAINTER, DECEASED, EMPLOYEE, CLAIMANT v. THE MEAD CORPORATION, EMPLOYER, SELF-INSURER, DEFENDANT.

(Filed 27 February 1963.)

**1. Master and Servant §§ 54, 56—**

Whether suicide following an accident causing injury to the brain and resulting in mental disorder or insanity, is compensable must be determined upon the facts of each particular case. G.S. 97-38, G.S. 97-12.

**2. Same— Evidence held to support finding that suicide was result of mental condition and not wilful intent of employee.**

Deceased employee received an injury to his head by accident arising out of and in the course of his employment. A cranial operation was performed to relieve what was diagnosed by the company physician as a blood clot producing pressure on the brain. Less than a month after the operation the employee committed suicide. There was testimony that after the injury and operation the employee suffered a complete change of personality and became progressively more emotional and depressed. There was expert testimony that due to the brain injury the workman was bereaved of reason and lacked control, and that in committing suicide he was dominated by a disturbance of the mind directly caused by his injury and its consequences, etc. *Held:* The evidence supports the finding of the Industrial Commission to the effect that the injury caused insanity to such an extent that the workman was without conscious volition in committing suicide, and the award of compensation is sustained.

**3. Master and Servant § 94—**

The findings of fact by the Industrial Commission are conclusive on appeal if supported by competent evidence notwithstanding conflicts and inconsistencies in the evidence which might support a contrary finding.

APPEAL by defendant from *Fountain, S.J.,* June, 1962 Specal Term, JACKSON Superior Court.

This proceeding originated as a claim for compensation and death benefits under our Workmen's Compensation Act. The parties stipulated:

"Prior to entering upon the hearing of the cause, it was stipulated between the parties that on July 21, 1960, the deceased employee and the defendant employer were subject to and bound by the provisions of the Workmen's Compensation Act, and that the employer-employee relationship existed on said date. That on said date the defendant was a self-insurer, and that the average weekly wage of the deceased employee was $78.40. That on July 21, 1960, while in the employment of the defendant, the deceased employee was injured by an accident arising out of and in the course of his employment, and the last day that he worked with the defendant was August 10, 1960, and that death occurred on September 2, 1960, and that it was self-inflicted. That Blanche P. Painter is the duly acting, qualified administratrix of the estate of Tolvin Edgar Painter, and, also, that she is the sole dependent of the deceased."

The plaintiff's evidence tended to show the following: For 27 years prior to July 21, 1960, Tolvin Edgar Painter had been a happy, contented and prosperous employee of the Mead Corporation. He was actively interested in sports, especially fishing. He delighted in having visitors, took great interest and pride in his family — especially his grandchildren — some of whom lived nearby. He had planned and was building a new home and spent much time supervising the construction. On July 21, 1960, while at work, he suffered a head injury for which he received first aid attention at the plant. Headaches of increasing intensity followed the injury, although he did some work. A cranial operation was performed by a neurosurgeon on August 10, 1960, for the purpose of relieving what was diagnosed by the company physician as a blood clot producing pressure on the brain.

The effects of the accident and surgery were described by Mr. Painter's wife, in part, as follows:

"He had an entirely different personality after he had this accident. He was worse after he had the operation. He had a headache from the accident. I noticed the change more as the days went by. He just gradually changed after the operation. He came home and was never himself any more. At first he complained of a severe headache and when he would take something for his head, he slept a lot. He seemed to be sleepy, and then, after the operation, he was just restless and he did not sleep. He couldn't sleep; he didn't sleep any hardly, just only when he had something to take to help him sleep; and he would wake at night just like a child that had had a bad dream. He would take a little nap

and he would wake and he'd jump out in the floor and turn the light on, just like he was scared, and he would complain of some kind of spells. He'd say, 'Something comes over me.' . . . He would make motions with his hands, and when he would make those motions with his hands, he'd stare. . . . he'd just stare out in space; it just seemed like he was staring into space, just like he was blank. . . I could not interest him in anything after he complained of these spells, . . . Some of these periods lasted longer than others, and they were getting more frequent, and he was getting worse all the time. When these periods would occur, sometimes he would get up and walk and sometimes he would just sit down, and sit down and stare, and sometimes he would walk. I have known him to get out and walk all the way around the house and come in, and it seemed to be like somebody walking in his sleep."

Mr. Poteet, general superintendent of the Mead Corporation, testified:

"I did see him the morning of his death. I was visiting out there with Mr. Painter. In reference to something coming over him, he was a very depressed man. He said, 'I'm just in all bad shape. This whole side is killing me,' and he made that kind of a motion, pointing towards his left side. He was running both hands like this, and he was very emotional, and I didn't stay very long on that occasion, and a couple of other occasions that I was out there, because it looked like the longer I stayed the more emotional and upset he got. This was different from his behavior prior to July 21, 1960, and prior to the date he bumped his head."

On the morning of September 2, 1960, after a restless night and without eating breakfast, Mr. Painter left the house and in a short time thereafter his body was found hanging from a rafter in the barn. The old rope around his neck had been used to secure the gate into the barn lot.

The evidence further disclosed that Mr. Painter was free of debt and that no trace of insanity had occurred in the family.

Dr. John D. Bradley, a specialist in psychiatry and neurology, testified in part:

"I have an opinion satisfactory to myself of the injury, whether there would be a causal relationship of the injury of the deceased on July 21, 1960, and the death of the decedent on September 2, 1960, based upon the findings set out. I should think from the his-

tory and findings that there is a definite causal relationship between the injury and his death, the suicide.

"I have an opinion on whether the decedent was so insane or bereaved of reason that the act was voluntary or a willful one. My opinion is that he was so—his judgment was so impaired, his control was so impaired or so decreased that he probably was unable to control this action and there in that sense it would be involuntary.

"I have an opinion satisfactory to myself as to whether the decedent had a mental disorder resulting from the physical injury. My opinion is that this man suffered a possible traumatic psychosis in the form of a depression, and that he was so depressed and upset and bereaved of judgment and reason that he would be considered insane.

"I have an opinion as to the cause of that mental disorder. In my opinion, I think the cause of this, or the precipitating main cause would be that of a disturbance in his brain physiology due to the concussion or trauma of injury.

"I have an opinion as to whether the blow on the head and injury to the brain could have or might have during certain intervals produced temporary insanity. My opinion is that he did have periods of insanity or acute depression where he was bereaved of reason as a result of the accident.

"I have an opinion whether at times, due to the brain injuries, the deceased could not will or purpose. I understand that to mean that at times this man was so bereaved of reason or lack of control, of judgment or the ability to control his self-destruction or other impulses or mostly cleared impulses that he was unable to control these things and that in that sense he would be unable to will or purpose if that is satisfactory to the Court.

"I have an opinion as to whether the deceased in committing suicide dominated by a disturbance of mind directly caused by his injury and its consequence. In my opinion, the deceased in committing suicide was dominated by a disturbance of mind directly caused by his injury and its consequence."

The defendant offered Dr. Robert S. Boatwright who performed an autopsy. He testified in part:

"I did perform an autopsy upon Edgar Painter on September 2, 1960. I only examined the head and cavity of the brain. I found only evidence of a recent operation. The operation had been three

pieces of bone removed, two in the front of the head, one in the back, and the operation was in that area. From my examination and observation, I ascertained that the tissue or the part that was operated upon had healed properly. I only found blood in the brain that would or could follow an operation of this type.

"I think the operation was approximately three or four days before the autopsy.

"There was a staining rather than blood. The cavity of the brain cell had been stained in blood. I found this blood or staining on the left side of the brain. This side of the brain controls the motion of the opposite side of the body. The brain operates in reverse order to the extremities of the body; they are the controlling motion. In my opinion, the blood or stains found was the result of the operation. After the operation of the type that was performed upon Mr. Painter, it is natural that these blood stains appear very frequently. It is not unnatural for them to appear." * * *

"I found about a quarter of an ounce of blood there over to the left. This clot was very thinly distributed over the surface of the brain over a good portion of the left side. There was none over on the right side, but it was a good portion of the surface on the left side of the brain. I would say it was approximately six inches; six square inches. That would be about two inches by three inches. I would say it was probably four inches by two inches. The four inches runs from the front to the back and about two inches wide."

In short summary, (omitting details) the Hearing Commissioner found: Tolvin Edgar Painter had worked for the Mead Corporation for 27 years. He had prospered and had been happy in his work, devoted to his family, and faithful to his church. On July 21, 1960, he suffered an injury by accident while performing his assigned duties as employee of the defendant. He received first aid treatment, but headaches began immediately and continued with increasing intensity until a brain operation was performed for the purpose of relieving what had been diagnosed as pressure from a blood clot on the brain. After nine days in hospital he returned home on August 20, 1960. His condition was found to be substantially as depicted in the evidence of Dr. Bradley, sketchily quoted in the statement of facts. The Hearing Commissioner summarized his findings as follows:

"9. That the accidental injury of deceased employee, Tolvin Edgar Painter, on July 21, 1960, caused the deceased to become

insane and mentally deranged to such an extent that he had an uncontrollable and irresistible impulse to such an extent that he became delirious and frenzied without rational knowledge of the physical consequence of his act, without conscious volition to produce death on September 2, 1960."

Upon the facts found and the conclusions based thereon, the Hearing Commissioner awarded compensation. The defendant filed detailed exceptions to all findings and conclusions, and requested review by the Full Commission, which in turn overruled all exceptions, adopted the findings, conclusions, and award made by the Hearing Commissioner. Thereafter, on appeal to the Superior Court, Judge Fountain overruled all exceptions, affirmed and approved the findings, conclusions, and award of the Full Commission. Whereupon the defendant appealed to this Court.

*J. Charles McDarris, Frank D. Ferguson, Jr., for plaintiff appellee.*
*Hall, Thornburg & Holt by W. Paul Holt, Jr., for defendant appellant.*

HIGGINS, J.　Our Workmen's Compensation Act G.S. 97-38, provides for payment of benefits to the defendants of an employee whose death "results proximately from the accident arising out of and in the course of the employment," unless "death was occassioned . . . by the wilful intention of the employee . . . to kill himself." G.S. 97-12.

In this proceeding the parties stipulated: (1) On July 21, 1960, Tolvin Edgar Painter, defendant's employee, suffered an injury "by accident arising out of and in the course of his employment." (2) "Death occurred on September 2, 1960, and that it was self-inflicted."

This Court has not passed on the question whether suicide following an injury by accident is compensable, and, if so, under what circumstances. Text writers, commentators, and other courts have dealt with the question on numerous occasions. By statute, in most cases, death is compensable if it proximately results (within time limits) from the industrial accident. Likewise, most states have statutes similar to our own denying recovery if death is the result of the wilful intent of the employee to kill himself. Many jurisdictions emphasize the proximate cause theory and do not attach much importance to the "wilful intent." However, cases of suicide are so different and dissimilar that each case must be classified according to its own facts.

In 1915 the Supreme Judicial Court of Massachusetts adopted what has become known as the harsh rule. "It is that where there

follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy 'without conscious volition to produce death, having knowledge of the physical consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary willful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury." *In Re Sponatski*, 220 Mass. 526, 108 N.E. 466.

Other courts followed and the foregoing became the majority rule. Among cases supporting the rule are: *Jones v. Traders & General Ins. Co.*, 140 Tex. 599, 169 S.W. 2d 160; *Barber v. Industrial Commission*, 241 Wis. 462, 6 N.W. 2d 199; *Karlen v. Department of Labor and Industries*, 41 Wash. 2d 301, 249 P. 2d 364.

On the other hand, the English courts, *Marriott v. Maltby Main Colliery Co.*, 13 B.W.C.C. 353; *Graham v. Christie*, 10 B.W.C.C. (Scot.) 486; and a growing minority in this country have held that the death is compensable if a work-connected injury causes insanity which in turn induces the suicide. *Whitehead v. Keene Roofing Co.*, Fla., 43 So. 2d 464; *Delinousha v. National Biscuit Co.*, 248 N.Y. 93, 161 N.E. 431; *Burnett v. Industrial Commission*, 87 Ohio App. 441, 93 N.E. 2d 41; *Prentiss Truck & Tractor Co. v. Spencer*, 228 Miss. 66, 87 So. 2d 272; *Olson v. F. I. Crain Lumber Co.*, 259 Minn. 248, 107 N.W. 2d 223.

"The basic legal question seems to be agreed upon by almost all of the authorities: it is whether the act of suicide was an intervening cause breaking the chain of causation between the initial injury and the death. The only controversy involves the kind or degree of mental disorder which will lead a court to say that the self-destruction was not an independent intervening cause. . . . (I)f the sole motivation controlling the will of the employee when he knowingly decides to kill himself is the pain and despair caused by the injury, and if the will itself is deranged and disordered by these consequences of the injury, then it seems wrong to say that this exercise of will is 'independent', or that it breaks the chain of causation. Rather, it seems to be in the direct line of causation." The foregoing is according to Larson, The Law of Workmen's Compensation, Vol. 1, §§ 36.00, 36.20, and 36.30, p. 503, *et seq.*, citing many authorities.

The *Sponatski* rule has been criticized as an application of the test of criminal responsibility not justified in workmen's compensation cases. "Its effect is unnecessarily harsh as a measure of civil consequences. A different view prevails in a minority of jurisdictions. Reasoning that workmen's compensation policy demands a more liberal result, New York, Ohio, Florida, and Mississippi have judicially rejected *Sponatski*. Massachusetts, its state of origin, has overruled it by statute. This minority follows the English view that if a compensable injury results in insanity and such insanity results in suicide, the suicide cannot logically be an independent intervening cause if there is an otherwise unbroken chain of causation between the injury and the death." U.C.L.A. Law Review, Vol. 8, 1961, Workmen's Compensation, p. 673 *et seq.*, citing authorities. Actually an award of compensation was upheld in the *Sponatski* case. The evidence giving rise to the rule, however, does not appear to be more favorable to an award of compensation than the case now before us.

"Courts which take this position (suicide is an independent intervening cause of death) tend to confuse an intervening *act* with an intervening *cause*. As its name indicates, independent intervening cause stems from an *independent* agency and is not produced from a prior cause within the chain of causal connection. . . . if it can be shown by competent expert testimony that a compensable injury has caused insanity, which in turn has caused suicide, then the first cause, *i.e.*, the injury, is the proximate cause of this suicide." Iowa Law Review, Vol. 45, 1960, Workmen's Compensation, p. 669, *et seq.* citing cases and authorities.

As presented on this record, our specific problem is to determine whether the evidence is sufficient to support the findings of the Commission and whether the findings, in turn, sustain the award. The facts found, in our opinion, are sufficient to sustain the award, even under any reasonable interpretation of what we have quoted as the majority rule. Number 9, supplemented by the other findings, is sufficient to support the award of compensation. Hence, if the evidence is sufficient to permit the Commission to make the finding the law requires us to affirm the judgment.

Dr. Bradley's evidence (unobjected to) permits the inference and finding that periods of insanity followed as a consequence of Mr. Painter's injury during which his judgment was so impaired that he was not enabled to control his action. "(A)t times this man was so bereaved of reason or lack of control, of judgment or the ability to control his self-destruction . . . that he was unable to control these things . . . it would be my opinion, from this, that death resulted from the

uncontrollable impulses. . . . I think at the time he was aware he was going to meet his death." This evidence, in the light of what happened immediately before the suicide, permitted the inference the act of suicide occurred during a period of insanity. The evidence was sufficient to support finding No. 9. Whether it might support a different finding is immaterial. The Superior Court, in reviewing the Commission's order, and this Court, in passing on the appeal, are bound by the findings supported by the evidence, the weight of which is for the Commission. Conflicts and inconsistencies in the evidence come to us resolved by the findings of the Industrial Commission.

In holding the evidence sufficient to support a finding that by reason of insanity the suicide was the result of an uncontrollable impulse, or in a delirium of frenzy without conscious volition to cause death, we are not thereby to be understood as fixing as our standard the rigid rule of the *Sponatski* case. We go no further now than to hold the evidence was sufficient to meet the reasonable tests of that rule which the Industrial Commission seems to have used as the standard. Any further discussion is not now required. The judgment of the Superior Court is

Affirmed.