**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**Eileen SAUNDERS et al., Appellees.**

**No. 1070.**

Court of Civil Appeals of Texas,
Houston (14th Dist.).

Nov. 20, 1974.

Rehearing Denied Dec. 11, 1974.

Tom M. Davis, Jr., Donald B. McFall, Butler, Binion, Rice, Cook & Knapp, Houston, for appellant.

Marvin B. Peterson, Jr., Combs & Archer, Houston, for appellees.

*Majority Opinion*

CURTISS BROWN, Justice.

This is a workman's compensation case.

Appellant, Texas Employers' Insurance Association (Employers), appeals from a final judgment of the trial court awarding death benefits to Eileen Saunders and her minor child (appellees). Appellees had filed a claim with the Industrial Accident Board which resulted in a denial of compensation. They then filed this suit. Trial was to a jury. The jury found in answer to special issues as follows: that the back injury of February 8, 1972, to James E. Saunders (appellees' spouse) combined with his subsequent medical treatment for such injury caused him to become so deranged that he was compelled to take his own life through an uncontrollable impulse; that the injury so suffered, combined with the resulting derangement, was a producing cause of the death of Saunders; and that the taking of his own life was not caused by his wilful or voluntary intent to injure himself.

On February 8, 1972, Saunders slipped in heavy mud surrounding the area wherein he was working and sustained what proved to be a serious back injury. Shortly thereafter, he was admitted to the hospital

where a lumbar laminectomy was performed. In April 1972, he was readmitted to the hospital for treatment of thrombophlebitis of the left leg. Appellant authorized and paid for these hospital stays and procedures as well as paying other compensation benefits. He was unable to return to work although he wanted to. Sometime in July 1972, his pain became more intense, and he began to take more and more medication which was prescribed for him by his doctors. He was readmitted to the hospital in August 1972, and dismissed in September. He then consulted another doctor who gave him the impression that there would need to be more hospitalization. On Sunday, September 24, 1972, he was observed taking his medication prior to his wife's and daughter's departure for church. Upon returning from church, at about 12:15 P.M., that day his daughter discovered him dead as a result of a self-inflicted shotgun wound. Mrs. Saunders testified that after July of 1972, she noticed that her husband seemed to be in greater pain and that he became more withdrawn and that he would take greater amounts of medication. The doctor and his associate, who originally treated the back condition, were of the opinion that nothing further could be done for the injury. The doctor, consulted in September, believed that further hospitalization was in order and suggested exploratory surgery. After the accident and throughout this entire period, the doctors involved prescribed various medication for Mr. Saunders. The prescriptions in force at the time of his death included ones for Valium, Darvon N, Phenaphen #3 and Soma. The first three of those drugs are analgesics, while the last is a muscle relaxant. There was testimony as to Saunders' behavior through the period from the accident until his death. Up until July, Saunders appeared to be in good spirits. He enjoyed visitors and according to neighbors took an active interest in neighborhood activities. Thereafter, Saunders began to become more withdrawn. He spent less and less time out of his room. There was testimony that he would just stare as if in another world. He was observed on a number of occasions to take two or more pills from different bottles of medication. In fact, he was observed to take two or more pills from different bottles on the morning of his death. There was no suicide note. When asked on that morning if he wished to accompany his wife and child to church, he replied that his back hurt so badly that he would be unable to sit for the time called for.

There was also testimony by Dr. Doak, appellees' expert witness, as to the medication prescribed, the effect of combining the various medicines, and his opinion as to the relationship of the injury and treatment to the suicide. He testified that Valium tends to slow reaction, impair judgment and in some individuals cause depression. He testified that it can bring about very miserable states of mind with feelings of guilt, feelings of worthlessness, desire to withdraw from people, from activities, and can give rise to strong suicidal urges in some people. He testified that Darvon N is a drug that is chemically related to some of the pain relieving opiates, but is not addictive. He also testified that it has little effect on thinking and emotion. Phenaphen #3, he stated, while also a drug with little addictive tendency, is a depressant. He also testified that any of these drugs, when given to a person who is otherwise depressed, could make that depression worse. He also stated that a man's judgment could be impaired so much that he could not distinguish right from wrong, "in the sense that a person's sense of values would be quite, quite distorted, and he might well feel impelled to do something that otherwise he would not be impelled to do."

Dr. Doaks testified:

I would say that it's very probable that this act of suicide was brought on by a state of profound emotional depression which had its basis in the actualities of the man's situation, of pain and disability —I suppose he would have a somewhat

hopeless outlook had his two doctors disagreed as to what should be be (sic) done, and his normal good sense, that should have kept him from doing such a thing, would be largely altered by the combinations of medicines that he was taking, because he was taking several different ones that individually can cloud judgment and working together are well recognized to augment these effects of one another.

He further stated:

I believe—I may have covered this in my previous answer. I would not want to include the word mental—the expression mental disease because that implies in our specific medical term something this man didn't have, apparently, as far as I know he didn't have, but the continuing pain, the prolonged disability, the repeated trips to the hospital, the confusion in his mind when the two doctors disagreed as to what should be done, whether he should have another operation or not, all of those facts would be depressing to anyone and as I said before the effect of these medicines very probably in a susceptible individual could induce a state of mind, and outlook, a distortion of values, an impairment of judgment that would interfere with the operation of his normal good sense, and make him very likely to do what he did.

With reference to whether the act of the deceased was wilful or intentional, he testified:

Well, I would suppose that the man knew that he was picking up a shotgun and that he knew that he was taking his life. It wasn't an act of autonomism (sic) or unconscious, but it was the result of a loss of judgment, loss of sense of values an an intoxicated act, you might say an intoxicated, irrational impulse that was not based on a realistic evaluation of his situation.

Employers has presented a number of assignments of error. The principal thrust of appellant's attack is that there was no evidence to sustain the jury's findings and that it was entitled to an instructed verdict or judgment notwithstanding the verdict as a matter of law. Of course, in dealing with no evidence points only the evidence in support of the verdict can be examined and it must be in the light most favorable to the jury's findings. Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914).

The controlling authority is Jones v. Traders & General Ins. Co., 140 Tex. 599, 169 S.W.2d 160 (1943, opinion adopted). In that case the employee stepped on a nail which penetrated the ball of his foot. The wound became infected and it was necessary for Jones to have it treated, opened and drained a number of times during a period of several weeks. He suffered intense pain. There was much evidence concerning the seriousness of the pain Jones suffered and his reaction to it. He drank a mixture of concentrated lye, cleaning fluid and insect poison which caused his death three days later. In setting forth the rule, the Commission of Appeals stated:

The Court of Civil Appeals in both of its opinions adopted as applicable and controlling the following rule from 71 Corpus Juris, p. 638: "Provided the insanity results from a compensable accident and not from a brooding over the injury or other causes, the suicide of an employee while insane may entitle his dependents to compensation therefor; thus, where there follows as a direct result of the accident an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death, there is a direct and unbroken causal connection between the physical injury and the death; however, where the suicide is the result of voluntary and willful choice determined by a moderately intelligent mental power with knowledge of the purpose and effect of the act, even though dominated by a disordered mind, a new and

independent agency breaks the chain of causation."

An annotation in 56 A.L.R. 459, 460 thus states substantially the same rule: "Accordingly, when an accident under compensable circumstances ends in self-destruction, which is the result of uncontrollable impulse, or a delirium of frenzy, and without conscious volition to produce death, with knowledge of the physical consequences of the suicidal act, it has been held, even in the American cases, that there is a direct and unbroken causal connection between the accident and the death, and compensation therefore is to be awarded." (Jones v. Traders & General Ins. Co., *supra,* at 162).

■ The evidence in the case under consideration fully justifies the conclusion that Saunders' injury and the accompanying medical treatment was a producing cause of his suicide. Indeed, the record would justify the conclusion that had he not received the compensable injury and been treated therefor he would not have taken his life. If the question were one of whether the compensable injury and the resulting medical treatment "contributed" to, or was a proximate cause of, the suicide the answer would surely be in the affirmative.

However, that is not the question here under the rule announced in Jones. In order for the surviving beneficiaries to recover for suicide under this rule, it is necessary that the victim take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition. Where the suicide is the result of a voluntary choice, a recovery of compensation benefits is not permitted even though the claimant may have been dominated by a disordered mind. The evidence must raise the issue of uncontrollable impulse or a delirium of frenzy without a conscious volition to allow recovery.

Viewed in the light most favorable to the verdict, we cannot say that there is some evidence here meeting the test of

Jones. In fact, our duty compels us to say that it does not and that the case must be reversed and rendered. In view of this holding, it will not be necessary to consider appellant's other points of error.

Reversed and rendered.

COULSON, Justice (concurring).

I concur that this case is controlled by the decision of the Supreme Court in Jones v. Traders & General Ins. Co., 140 Tex. 599, 169 S.W.2d 160 (Tex.Sup.1943). However, the rule stated in that case should be reviewed at this time in light of the present state of scientific knowledge of medications and their effects upon human behavior.

In the case before this Court, the evidence establishes that the deceased employee, Saunders, as a result of his work related injury, was subjected to back surgery. He had thrombophelibitis and chronic and severe pain which required his physicians to simultaneously prescribe four different drugs in order to afford him a degree of relief from his torment. At and before his death, Saunders was under the influence of such prescribed drugs which, when combined, induced mental depression and altered his normal mental processes in a manner which impaired his normal good judgment. The combination of the pain resulting from his injury, together with the prescribed medication, so impaired his thought processes that he did a tragic thing in taking his life. The evidence would justify a conclusion that Saunders would not have committed that final act but for the injury suffered in the course of his employment, the consequential pain and suffering, and the medical treatment made necessary as a result of such injury.

Since the Jones decision, medical science has made significant progress in knowledge relating to psychotropic drugs and their effect upon behavior. It is now known that use of such drugs can alter normal patterns of human thought, reasoning, and behavior.

246

Mr. Saunders is dead. A proximate cause of his death was the chain of events initiated by the injury which he suffered while in the course of his employment. The Workmen's Compensation Act was intended to compensate the dependent survivors of a workman who died as a result of job related injuries.

It should not be necessary for the dependent survivors of a deceased employee to meet a burden of proof on the issue of insanity more onerous than that required by Texas courts in criminal cases where insanity is raised as a defense. 16 Tex. Jur.2d Criminal Law § 93 (1960).

The act of Mr. Saunders in taking his life should be judged in the light of medical testimony to the effect that he could not bring his conduct within the standards normally applied when evaluating human behavior because of the effect of the injury and the medications which were prescribed to treat that injury.