**EXXON CORPORATION, Appellant,**

v.

**Sue BRECHEEN, Appellee.**

**No. 16407.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Jan. 9, 1975.

Rehearing Denied Feb. 13, 1975.

Eino Zapata, Robert D. McGee, Houston, for appellant; Fulbright & Jaworski, David J. Beck, Houston, on appeal only.

Frank Stovall, Houston, Allen Glenn, Abilene, for appellee.

COLEMAN, Chief Justice.

This is an action for damages under the Survival Statute, Article 5525, Vernon's Annotated Civil Statutes, combined with a suit under the Wrongful Death Act, Article 4671 et seq. A judgment was entered for the plaintiff based on a jury verdict.

On March 10, 1970, William D. Brecheen, Jr., driving a tank truck for his employer, Oil Transport Company, arrived at Gate No. 5 of Humble's Baytown refinery. He had worked as a tank truck driver for many years. He was headquartered in Abilene, Texas. Ordinarily his cargo was gasoline. He had made two previous trips

to the Baytown refinery. After the first trip the regulations were changed and he had to sign in and sign out.

Before entering the premises on this occasion Mr. Brecheen was stopped at the gate and signed in. The printed form provided for signing in was headed "General Release and Acknowledgment Regarding Traffic and General Instructions." This was printed in red in heavy type and underlined. Also printed in red and in large letters immediately below the heading was:

"In consideration of the permission granted me by Humble Oil & Refining Company, N. J. Chemical Company, and Esso Research & Engineering Company, at my request, to enter their Baytown plants or premises at the time shown in column 6 below, I, by my signature in column 1 below, do hereby release and discharge Humble Oil & Refining Company, N. J. Chemical Company and Esso Research & Engineering Company, their officers and employees, from all liability to me, my heirs and legal representatives for all loss, damage, injury, or death to me or my property caused in whole or in part by the negligence of said Humble Oil & Refining Company, N. J. Chemical Company, Esso Research & Engineering Company, their agents or employees, while I am at said plant or premises.

"By my signature in column 1 below, I also acknowledge receipt of a copy of the above named companies' Traffic and General Instructions Form No. 541–0015 and hereby state that I have read and understand said instructions."

Below printed in black are six numbered columns. Column 1 bears the legend "Signature of person entering Baytown plants or premises." Column 2 bears the legend "Company or Employer Represented." Column 3, "Vehicle License Number"; Column 4, "M. D. Order Number"; Column 5, "Entry Authorized by"; Column 6, "Entry Time Date"; Column 7, "Departure Time Date". Below the column headings are eighteen lines for the signature of the person entering the Baytown premises and the information requested. Eighteen different signatures appear in Column 1.

After signing in, Mr. Brecheen drove his truck to a loading rack, positioned it for loading and climbed stairs onto the loading rack. The loading rack was approximately 200 feet long, 15 feet high and five to six feet wide with stairs at both ends. There were six telescopic loading chutes on each side of the loading rack. A loading chute is a 3-inch aluminum pipe that would telescope. While standing on the rack, Mr. Brecheen engaged in conversation with another truck driver, and at that time a loading chute came loose from a nearby railroad tank car hatch and began to spray the decedent and his companion with oil.

Mr. Brecheen testified by deposition taken prior to his death. He testified that the oil hit him flush in the face and knocked him against the rail and down onto the walk. He was knocked back against the safety rail and down to his hands and knees. His eyes were filled with oil and it felt like an explosion in his head. The man in charge of the loading platform took them to the shower room to clean off. He had to be led because he couldn't see. He was then taken to the dispensary where they washed his eyes and ears and put some drops in his eyes. Meantime the truck was loaded. He returned to the truck, drove it to the weighers and then to the exit where he signed out. He had called and reported the incident to his employer who instructed him not to drive that day. He then drove to a motel and spent the night. The doctor had given him two capsules for headache, but he didn't take them that night. His eyes bothered him and his ears were ringing.

The next morning he drove to Comanche where he took the headache tablets. On the drive from Comanche to Abilene he didn't remember anything. That night he completely went out of his head and his wife couldn't hold him down. She called her brother for help. He was trying to

put on his clothes to go to work. He fell off the bed a time or two. The next morning he went to Dr. Sibley. Thereafter he visited several medical doctors who found no physical cause for his medical problems. On June 1, 1970 he began visiting Dr. Summers, a family practitioner, who had trained in psychiatry as a resident physician for fourteen months. He had devoted about 25% of his time for ten years to patients having psychiatric problems. Dr. Summers saw him every two weeks for awhile and then weekly. On December 30, 1970, ten months after the accident, Mr. Brecheen was admitted to Timberlawn Psychiatric Hospital where he was treated and discharged on January 29, 1971. He was diagnosed as having a residual type schizophrenia. On February 20, 1971 he was given a follow-up examination by Dr. Peden, the treating Timberlawn psychiatrist. Dr. Peden found that at this time Mr. Brecheen was free from acute symptoms of schizophrenia. Dr. Peden felt Mr. Brecheen had recovered from his acute schizophrenic episode and recommended that he return to work. On August 17, 1971, this suit was filed by Mr. Brecheen. On December 19, 1972, 34 months after the accident, Mr. Brecheen wrote a coherent suicide note to his wife, went into the garage with a rifle and took his life.

On February 2, 1973 a suggestion of death was filed and Sue Brecheen moved that the suit be continued in her name individually as community survivor and as representative of any and all beneficiaries of the deceased under the Wrongful Death Act. An amended petition was thereafter filed in the name of Sue Brecheen as plaintiff. The defendant filed an answer which contained a plea that Mr. Brecheen had released the company by signing the instrument, previously described, when he entered the plant. The plaintiff filed a supplemental answer alleging that the written release was executed under circumstances of coercion and duress, both mental and physical, causing the deceased, William

T. Brecheen Jr., to act contrary to his own free will; that the release was executed under circumstances of employment oppression, inequality of bargaining position between the parties, and complete economic disparity between the parties. She further alleged that the release was not supported by reasonable and adequate consideration; that the deceased was at all times material acting as an agent and an employee of Oil Transport Company, and that any consideration for such release passed to his employer and not to the defendant. The plaintiff further alleged that the release was void for reasons of public policy.

Prior to the voir dire examination of the jury panel and before any evidence had been presented the plaintiff moved the court to instruct counsel for the defendant and their witnesses to refrain from stating or bringing to the attention of the jury in any way the fact that William D. Brecheen, Jr. had entered into or attempted to enter into any release with the defendant by which the deceased released or purported to release the defendant from any liability or legal damages arising out of its negligent acts or omissions while he was on the property or premises of said defendant. During the course of the trial counsel for defendant requested the trial court to permit him to present certain matters to the court in the absence of the jury. After the jury had been removed he then stated to the court that he desired to tender into evidence testimony concerning the release of liability. After evidence was produced before the court establishing the execution of the release by Mr. Brecheen, the release was marked as an exhibit and offered into evidence. It was then admitted on the bill of exceptions of the defendant. Defendant again offered the exhibit for all purposes except that it not be exhibited to the jury nor referred to in any proceedings in their presence. The court then stated that it is not admitted as per the motion in limine. No testimony was heard at that time which would support the court's action in excluding the release.

The record reflects that the employer of Mr. Brecheen has a business relationship with the defendant of considerable importance to said employer. It is a matter of common knowledge that the defendant is a large and successful business entity, and it might be inferred that there is a substantial disparity in the bargaining power of the defendant, Mr. Brecheen, and Mr. Brecheen's employer. It is also a matter of common knowledge that the premises on which are located facilities for the processing and storage of petroleum products are potentially extremely dangerous. This aspect of the case has not been fully developed in the evidence, but there is evidence that oil spills occur with some regularity. Defendant's Exhibit 1 was signed by eighteen drivers representing seventeen different companies. This fact together with the testimony of Mr. Brecheen supports the conclusion that all non-employee drivers of motor vehicles entering the premises were required to sign the release. The nature of the business relationship between Mr. Brecheen's employer and the defendant was not fully developed in the evidence.

While there is no direct testimony on the matter, it appears that due to the potential for serious bodily injury inherent in the operation, the defendant as a matter of business judgment has adopted a policy designed to reduce its exposure to liability by requiring the signing of releases of liability by its business invitees as a condition to their admittance to the premises. There is evidence that Mr. Brecheen was required to sign in and sign out on at least one prior trip and that other drivers for Oil Transport also loaded cargoes at the Baytown refinery. There is no evidence that Mr. Brecheen had read the release or that he knew that by signing the instrument he released the defendant from liability for its own negligence. The heading of the instrument, "General Release and Acknowledgment Regarding Traffic and General Instructions," might well indicate to a truck driver that the instrument referred to traffic conditions and accidents. Not only is there no evidence as to the actual knowledge of Oil Transport, Mr. Brecheen's employer, as to the requirements for entrance into the plant, but there is no evidence that Oil Transport Company as a condition of employment required its drivers to make the trip to the Baytown refinery.

■ A trespasser on land is a person who, not having title to the land, without consent of the true owner, makes entry thereon. 56 Tex.Jur.2d, Trespass, Vol. 56, p. 11. Since the defendant had the right to deny Oil Transport and its employees entry into its premises, it would appear that the company would also have the right to condition an invitation to enter its premises to those willing to sign a release of liability unless such action would be considered contrary to the public policy of this state.

■ In Allright, Inc. v. Roy Lee Elledge, Jr., 515 S.W.2d 266, the Supreme Court stated:

"Parties may agree to limit the liability of one for future negligence unless the agreement violates the constitution or statutes or public policy . . .

"In determining whether a contractual agreement limiting liability is against public policy we look to the relationship between the parties. If because of this relationship there exists a disparity of bargaining power, the agreement will not be enforced. Crowell v. Dallas Housing Authority, 495 S.W.2d 887 (Tex.1973). A disparity of bargaining power exists when one party has no real choice in accepting an agreement limiting the liability of the other party . . ."

The court further stated:

"The certified question specifies that the limitation of liability is in 'a written agreement entered into' by the owner of the parking lot and the owner of the automobile. If the written agreement is signed by the bailor, and if there is no

circumstance that would deprive him of a freedom of choice . . . we see no satisfactory cause for avoiding the terms of the contract."

In McAshan v. Cavett, 149 Tex. 147, 229 S.W.2d 1016 (1950), an automobile bailment case, the court said:

"But the sign was not seen by Mrs. Cavett and it was not called to her attention. She did not read the identification check, and her attention was not directed to what was printed on it. The general rule, and especially that of the more recent decisions, is that limitations of the bailee's responsibility expressed on signs or printed on claim checks do not become parts of the contract of bailment and do not bind the bailor unless they are called to his attention . . . ."

In Crowell v. Housing Authority of the City of Dallas, 495 S.W.2d 887 (Tex.1973), a summary judgment case, the court held an agreement exempting the Housing Authority from liability for its own negligence was contrary to public policy and void "in so far as it purports to affect respondent's liability in the present case." The court stated:

"Agreements exempting a party from future liability for negligence are generally recognized as valid and effective except where, because of the relationship of the parties, the exculpatory provision is contrary to public policy or the public interest. If the contract is between private persons who bargain from positions of substantially equal strength, the agreement is ordinarily enforced by the courts. The exculpatory agreement will be declared void, however, where one party is at such disadvantage in bargaining power that he is practically compelled to submit to the stipulation . . . ."

In the Allright case, supra, and the Crowell case, supra, it is stressed that we must look to the relationship between the parties to determine the disparity of bargaining power. Brecheen was employed by Oil Transport Company. 90% of its business is the transportation of petroleum products produced by the defendant. It would be unreasonable to assume that Oil Transport would willingly terminate this business relationship with the defendant because the defendant requires its employees to sign a release of liability for the defendant's negligence resulting in injury to such employee while on the defendant's premises. We conclude that the evidence in the record before us is sufficient to show such a relationship between Mr. Brecheen, his employer, and the defendant as to create such a disparity of bargaining power that the agreement should not be enforced. While the relationship between the defendant and Oil Transport is not developed fully, Mr. Brecheen knew that 90% of his employer's business was with Humble, and, even if we assume that he knew the nature of the agreement which he signed, it is evident that he had no bargaining power. The trial court did not err in determining as a matter of law that the release was void, and, therefore, in refusing to admit it into evidence.

The jury found that on the occasion in question the defendant failed to secure the rope in question to the metallic spout as a person of ordinary care would have done and that such failure was a proximate cause of the occurrence in question. It also found that the defendant failed to make such inspection of the rope that was used to tie the spout to the railroad tank car hatch as a person using ordinary care would have done and that such failure was a proximate cause of the occurrence in question. Further findings made by the jury were:

Special Issue No. 5—The oil spray incident in question caused William Brecheen to have the mental illness or disease made the basis of the suit;

Special Issue No. 6—The oil spray incident in question caused the death of William Brecheen.

The appellant, Exxon Corporation, has attacked the jury's answers to Special Issues Nos. 5 and 6 on the basis that they are not supported by the evidence. The defendant also contends that the trial court erred in entering a judgment under the Wrongful Death Statute because there was no finding by the jury that the oil spray incident was a proximate cause of the death of William Brecheen. The defendant points to the fact that there was no finding by the jury that Mr. Brecheen did not know and understand the nature and consequences of his act when he took his life or that he was at that time acting under an uncontrollable impulse caused by the oil spray incident and that there is not sufficient evidence to support such findings had the issues been submitted to the jury.

There is nothing in the record to reflect that an issue as to whether or not the accident in question proximately caused the death of Mr. Brecheen was requested. No such issue was submitted. There was no objection to the charge by reason of the failure to include such an issue. The defendant filed a motion to disregard Special Issue No. 6 and for a judgment non obstante veredicto in so far as the judgment awarded recovery under the Wrongful Death Statute. This motion was denied. In support of its position appellant cites Jones v. Traders & General Insurance Company, 140 Tex. 599, 169 S.W.2d 160 (1943). This was a workmen's compensation case in which the jury found that Tom Jones suffered an injury in the course of his employment, which was a producing cause of his death; that the injury caused Jones to become mentally unbalanced to the extent that he did not understand the consequences of his act in taking his own life; that such mental condition was a producing cause of his death; and that the taking of poison by Jones was not caused by his wilful intention and attempt to injure himself. The court stated the question for decision as being whether there is any evidence of probative value to sustain the foregoing findings of the jury,

all of which relate to the question of causal connection between the injury and the death.

In *Jones* the court stated, as being the applicable rule:

" . . . Suicide is an independent agency that breaks the causal connection between the injury and the death if the mental condition of the victim, though disordered, is such that the suicide is the result of voluntary and willful choice; but if the insanity is so violent as to cause him to take his life through uncontrollable impulse or in a delirium or frenzy, there is a direct and unbroken connection between the injury and the death."

The court stated they did not find in the testimony "evidence tending to prove a derangement or an insanity of such violence as to cause Jones to take his life through an uncontrollable impulse or without conscious volition. . . . The evidence conclusively proves that he drank the poison for the purpose of taking his life and thus to put an end to his suffering, and that he did so deliberately, voluntarily and willfully."

There was medical testimony in the Jones case and the court in discussing it stated:

"Dr. Collins testified to his belief that Jones was insane or deranged or 'out of his mind' at the time when he took the poison, but he expressed no opinion as to the extent of his derangement, that is, whether his insanity was of such violence as to destroy his power to act consciously and voluntarily. The doctor stated that he did not and would not testify that Jones was not rational at the time. It clearly appears from the testimony of Dr. Collins that he reached the conclusion that Jones was insane or 'out of his mind' solely because of his belief that anyone who would commit suicide is 'off balance'. Such opinion is not expert opinion of probative value based on facts

proven or assumed and relevant to the matter in issue. It is merely the expression of the belief of the witness, so general, speculative and conjectural in its nature that it could give no appreciable aid to the jury on the issues submitted to it . . . The same is true of the opinion expressed by Dr. Launey, the substance of which has been given. Neither opinion is of aid in answering the particular inquiry on which the case turns, that is, the extent of the victim's derangement at the time when he drank the poison."

In the Jones case the testimony of Dr. Collins was that he was of the opinion that the industrial accident resulted in an injury which caused Mr. Jones such intense pain over a period of time as to destroy Jones' sense of reason and that as a result of such suffering he was mentally deranged.

In our case Mr. Brecheen showed symptoms of mental trouble on the day following the accident. Indications of mental trouble continued with some remissions up until the approximate time of his taking his own life. Mr. Brecheen had no history of previous mental, psychotic, psychiatric or nervous problems prior to the injury. Dr. Summers admitted Mr. Brecheen to the West Texas Medical Center where he was hospitalized from September 16 through October 13, 1970. During this period he diagnosed the deceased's condition as being ". . . a conversion reaction with an underlying schizophrenic reaction." He defined the term "a schizophrenic reaction" as being a split mind in that one could be realistic and appropriate in some aspects of his life, but in other aspects such a person could be "very unrealistic and unappropriate and unlogical and sick." He stated that this condition was a psychosis and defined it as follows:

"Well, in a psychosis, people, . . . they are not realistic, and they react to things in a bizarre and illogical manner."

He stated that persons with such a psychosis are removed from reality and are disoriented in their thinking. On December 30, 1970, on the recommendation of Dr. Summers, Mr. Brecheen was admitted to Timberlawn Psychiatric Center where he was treated by Dr. James Peden, a certified psychiatrist and the medical director of the hospital, who specialized in the practice of psychiatry. In his treatment and examination of Mr. Brecheen Dr. Peden found " . . . The content of his thinking had a paranoid tenor to it, but primarily it was made up of ruminations, about changes in his body, his vision, diffusion of his vision, migrating type of headaches, and other what appeared to be distortions of his image of himself." He stated that Mr. Brecheen at that time did not have the capacity to adequately differentiate between that which was real and what his interpretation was of what was going on. He gave his impression that the patient was suffering from schizophrenia, which is "characterized by certain changes in the feeling of the individual, certain changes in the way they associate things with each other, changes in the way they make decisions." Those suffering from this illness are ambivalent and "have a tendency toward the withdrawal or investment of their feelings within themselves, primarily, sort of living in a dream world or fantasy world." He felt that the majority of the symptoms that Mr. Brecheen presented had a paranoid tenor or paranoid flavor to them. He gave an opinion that there was a causal relationship between the schizophrenia that he observed in Mr. Brecheen and the oil spraying incident which occurred in March of 1970.

When he discharged Mr. Brecheen from the hospital he gave a discharge diagnosis of schizophrenia residual type, which means simply that there continued to be evidence of perhaps defective functioning of his personality. He showed evidence of personality disorders without manifest symptoms that were incapacitating. His prognosis was "short term—favorable, long term—guarded." By "long term—guarded" he meant that his long term prognosis was unpredictable. He testified that when

he first saw Mr. Brecheen he considered him to be psychotic which means that he had lost the capacity for reality testing and did not have the capacity to determine whether what's going on either inside him or around him was real. He considered that at the time of his discharge the psychotic aspect of his illness had cleared. An individual may be psychotic at times, and at other times may not be.

Dr. Peden could not elicit any history that Mr. Brecheen was laboring under any form of psychosis before the incident of the oil spray. However he got the impression that there was some evidence of some disturbed feeling during that time. He testified that Mr. Brecheen feared his brain was damaged and feared that his eyes were damaged. He believed this to be true and could not accept the reassurances of his doctors that these things were not true. He experienced a great deal of anxiety. He suffered a great deal of discomfort in the form of headaches. He showed evidence of being tense and complained of his stomach and distress in his stomach and it was the opinion of the doctor that he felt what he was describing. It was the opinion of the doctor that these conditions were primarily ideas that he had. These were things that were the way he saw himself at that time. He testified that at the time he discharged him from the hospital some of the basic defects were still present and that his future condition depended entirely on what kind of stresses he might be subjected to. He further testified that although Mr. Brecheen might not be subjected to any stress, "the thing may just come back at any time." He felt that getting sprayed in the face with oil was a contributing factor to the production of a psychosis in Mr. Brecheen because of the intense fear that he experienced. "The stress was probably related to perhaps the fear that he was going to die, the fear he was going to be blind, a fear that he was going to be brain damaged." He testified that whether or not a person develops a psychosis or schizophrenia from an event is not necessarily dependent upon the degree of the trauma, that it depends rather on the vulnerability of the individual.

After Mr. Brecheen was discharged by Dr. Peden he continued to be treated from time to time by Dr. Summers. Both doctors had prescribed medications for Mr. Brecheen. Dr. Summers prescribed various drugs for the purpose of combatting his psychotic tendencies and his depression. In his deposition taken before the death of Mr. Brecheen, Dr. Summers testified that Mr. Brecheen was suffering from a schizophrenic conversion depressive reaction, and that it was caused by the oil spraying into his face. On August 24, 1973, after Mr. Brecheen's death Dr. Summers gave another deposition. The last time Dr. Summers saw Mr. Brecheen was on December 12, 1972. At that time Mr. Brecheen informed him that he was extremely nervous and tense and he had been walking the floor with headaches and that his stomach was upset. He said that he had had an easy job with the County but couldn't do it and had to quit. The doctor found him despondent about his inability to be productively employed. At that time he felt that Mr. Brecheen's condition was the same that had been bothering him for the past two years, that is, his schizophrenic reaction and conversion reaction. It converted his emotional tensions into physical symptoms of "headaches and vomiting, etc." He felt that his condition had not improved from that on February 8, 1972. He had found during the time that he had been treating Mr. Brecheen that his condition "waxed and waned." He stated: ". . . I thought it was just a normal, or the usual, and usual wane, and low period that he was going through." Dr. Summers testified that when Mr. Brecheen committed suicide on December 19, 1972 he was still laboring under this schizophrenic or psychotic state that he had found on December 12. He testified that this schizophrenic state was the same condition that

the man had been laboring under since March 10, 1970. It was his opinion based on reasonable medical probability that there was a causal relationship between the incident at the Humble Oil Refinery on March 10, 1970 and the suicide or death of Mr. Brecheen on December 19, 1972. He testified that the accident at Houston was "a so-called straw that broke the camel's back." He testified that if the incident at the Humble Oil Refinery had not occurred the reasonable medical probability is that he would not have been laboring under the schizophrenic condition on December 19, 1972. He further testified that if Mr. Brecheen had not been laboring under the schizophrenic condition on December 19, 1972 in his opinion, based on reasonable medical probability, there would not have been a suicide or taking of his own life by Mr. Brecheen on December 19, 1972. He testified that it was foreseeable to him that Mr. Brecheen might ultimately take his own life as one of the consequences of his schizophrenic condition.

In answer to a question relating to an explanation of Mr. Brecheen's mental processes when laboring under the schizophrenic condition at the time he committed suicide, the doctor testified:

"  .  .  .  He felt like he was such a burden on his wife, that he was always around the house in her way instead of being out earning money, and sick thinking process, he thought he was taking the course that would help them best by getting rid of himself."

In answer to a question as to whether Mr. Brecheen was acting as a sane or an insane person at the time he committed suicide, the doctor testified:

"That is one of the things they debate about, but, it is my own feeling that a person is insane when they take their own life."

He stated that by the term insane he meant:

"Well, it's not—it's just not—just doesn't make good sense to take your own life. And that is not something we would do if we could think straight and could visualize how we could improve ourselves and be a happy and productive individual."

He then answered "yes" to the following question:

"Doctor, would it be characterized by disoriented thinking and inability to grasp reality as distinguished from illusionary type thinking?"

Finally he gave the opinion based on reasonable medical probability that the incident occuring at the Humble Oil Refinery on March 10, 1970 was a proximate cause of the suicide of Mr. Brecheen, stating:

"Yes, I think it was related directly."

He stated that at the time of Mr. Brecheen's last visit he never dreamed that he would be suicidal "because his—he would come in just seeming so upset that I never —he never had talked about suicide or anything like that. But, that last visit, he was despondent at that time about not being on any job, but, he wasn't any more despondent than I had seen him many, many times before."

Mrs. Brecheen testified that her husband never spoke of suicide and never talked about death as such. She testified that in the days just before his death there was no sudden change in his condition that she could see; that his mental condition so far as she could tell was normal for him. She testified that his condition would get better and suddenly get worse for no reason. There was testimony from Mrs. Brecheen and other members of the family that they had never noticed any signs of mental trouble on the part of Mr. Brecheen prior to the accident at Baytown. After the accident there were constant signs of mental trouble although the extent of his trouble would vary from time to time.

After Mrs. Brecheen discovered him dead, she found a note on the kitchen table. This note read:

"Dearest Sue. I know you hate me. I don't know how I will get better. You will be better without me. Tell Pam and David, Mother and Daddy I love them very much. It might help if you let the bank have the pickup and boat, and sell the house and move to town. Let David have my tools and guns. Let Daddy have his double barrel gun back. I am so sorry, Sue. I love you so much. May God and you forgive me. I love you, Sue.

/s/ Bill"

The evidence quoted, and other evidence in the record, clearly support a finding that as a result of the accident of March 10, 1970 Mr. Brecheen suffered mental illness which persisted to the date of his death. Dr. Summers' testimony that the accident and the resulting mental illness was a cause of his taking his life is weakened somewhat by his further testimony that no man in his right mind would take his own life. This testimony, however, was given as a professional opinion of a medical man who had training in psychiatry as a resident for 14 months and had subsequently spent approximately 25% of his practice "along the psychiatric line" for about ten years. He stated that there was a difference of opinion among medical men as to whether one who takes his own life is to some degree mentally unbalanced. We do not construe Dr. Summers' testimony as being to the effect that the only reason he considered that Mr. Brecheen's insanity or mental condition was a cause of his committing suicide rests upon his belief that anyone who would commit suicide was mentally unbalanced. In *Jones* the deceased did not become mentally unbalanced as a direct result of the accident made the basis of the case, but became mentally deranged as the result of the intense suffering and loss of sleep resulting from his injury. There is considerable evidence that Mr. Jones took his life in order to be re-

lieved of the intense pain he was suffering, and that he was rational immediately before he took poison and immediately after he took poison.

Section 455 Restatement of Torts 2d provides:

"If the actor's negligent conduct so brings about the delirium of insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

"(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

"(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason."

In a comment on clause (b) the Restatement paragraph (c) states:

"This clause applies where the other's insanity does not deprive him of his capacity to realize the nature or consequence of his act or from forming a purpose to kill or cause harm to himself and selecting means appropriate to accomplish his purpose, but his act is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his actions. It, therefore, includes acts done under insane delusions if they are sufficiently strong to preclude resistance by such reason as the insanity leaves to the person laboring under them."

Comment (d) provides:

"On the other hand, the fact that the actor's negligence causes harm to another which subjects him to recurrent attacks of extreme melancholia does not make the actor liable for death or other harm which the other deliberately inflicts upon himself during a lucid interval in an effort to terminate his life be-

cause of his dread of the increasingly frequent recurrence of these attacks."

Section 455 of the Restatement should be read in connection with the following section. Section 456 provides:

"If the actor's negligent conduct has so caused any bodily harm to another as to make him liable for it, the actor is also subject to liability for

"(a) fright, shock, or other emotional disturbance resulting from the bodily harm or from the conduct which causes it, and

"(b) further bodily harm resulting from such emotional disturbance."

Comment (f) under this section provides:

"Where the tortious conduct results in bodily harm, and makes the actor liable for it, there may be recovery for any further bodily harm resulting from the emotional disturbance. Thus where a pregnant woman is struck by a negligently driven automobile and injured, she may recover damages for a miscarriage resulting from her fright or shock, even though the medical evidence is that it was brought about solely by her mental reaction to the injury, and not by the injury itself."

Dr. Summers testified that the fright which Mr. Brecheen suffered as a result of the accident of March 10, 1970 precipitated a mental condition as a result of which Mr. Brecheen was unable to think in the manner that a normal person would. This inability to reason in a normal manner led him to accept suicide as a solution to his problems. There is tortious conduct resulting in bodily harm and further bodily harm resulting from emotional disturbance.

Mr. Brecheen's physical symptoms resulted solely from his mental condition in the opinion of the medical experts. His mental problem did not deprive him of his capacity to realize the nature or consequence of his act, or to form a purpose to kill or cause harm to himself, or to select means appropriate to accomplish his purpose. This appears to be established by the contents of the suicide note. However, if we accept Dr. Summers' testimony, the act was done under an insane impulse which was irresistible because his insanity prevented his reason from controlling his actions.

The evidence does not establish that Mr. Brecheen took his life during a lucid interval, or that his action was caused by his desire to be free of pain. It may be gathered from the suicide note that Mr. Brecheen was despondent over his condition and felt that his wife would be better off without him. This reasoning might well be the product of a disordered mind. The evidence reflects that Mr. Brecheen did get better after each psychiatric interview. Dr. Peden testified that his physical symptoms, and his pain, resulted from his inability to accept the assurances of his doctors that he had no eye or brain damage. There is no medical testimony to cast doubt upon the testimony of Dr. Summers that the suicide was caused by Mr. Brecheen's mental illness. The testimony that he had never been overly preoccupied with death and had never discussed suicide, or exhibited other suicidal tendencies indicates that the decision was made impulsively.

It must be recognized that the Supreme Court of Texas in Jones v. Traders & General Ins. Co., supra, held that suicide is an independent agency that breaks the causal connection between the injury and the death if the mental condition of the victim, though disordered, is such that the suicide is the result of voluntary and wilful choice. It has been previously noted that there is evidence in this case that the suicide was the result of voluntary and wilful choice. There is also evidence that the suicide was not voluntary and wilful because it was the product of mental instability. Jones requires that the mental instability be so "violent" as to cause the deceased to take his life through uncontrollable impulse. We consider that the word

"violent" adds little to the rule. If one's insanity causes him to take his life through an uncontrollable impulse, the act obviously is not the result of voluntary and wilful choice. The decided cases do not establish that the words "uncontrollable impulse" have any peculiar legal significance. Webster's New Collegiate Dictionary, 2d ed., defines impulse as "a sudden incitement to action, insight, etc.; a spontaneous inclination; as, to act on impulse." Paragraph (b) of Section 455 of the Restatement previously quoted appears to be a sound legal definition of the term. An act is the product of an irresistible impulse if the actor is insane and the condition of his mind makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason. There is evidence of probative value that Mr. Brecheen's mental condition caused him to take his life through an uncontrollable impulse as defined above. The evidence does not require a finding that Mr. Brecheen's act in taking his own life was a voluntary act that broke the causal connection between the injury and the death. Delinousha et al v. National Biscuit Co., 248 N.Y. 93, 161 N.E. 431 (1928); Whitehead v. Keen Roofing Co., 43 So.2d 464 (Fla. 1949); Koch v. Fox, 71 App.Div. 288, 74 N.Y.S. 913 (1902). See, Prosser, Law of Torts, 3rd ed. 1964, Sec. 51, p. 320. The negligence of the defendant, as found by the jury, must be deemed to have been the proximate cause of the death of Mr. Brecheen. Strauss v. LaMark, 366 S.W.2d 555 (Tex. 1963); Clark v. Waggoner, 452 S.W.2d 437 (Tex.1970).

■ The trial court erred in refusing to admit before the jury the testimony of the appellee, Sue Brecheen, that she was ceremonially remarried after the death of William D. Brecheen, Jr. and that she was so married at the time of the trial. After the death of Mr. Brecheen, but prior to the trial of this case, the legislature of the State of Texas enacted Article 4675a, Vernon's Annotated Civil Statutes, as an amendment to Article 4675, supra, the Texas Wrongful Death Act, which provided that evidence of the actual ceremonial remarriage of the surviving spouse is admissible in actions brought under the Wrongful Death Act.

■ Article 1, Section 16 of the Texas Constitution, Vernon's Ann.St., forbids the retroactive application of legislative enactments, but statutes relating to procedure or remedies do not fall within this constitutional prohibition. Regal Properties v. Donovitz, 479 S.W.2d 748 (Tex.Civ.App.—Dallas 1972, writ ref. n. r. e.); Holt v. Wheeler, 301 S.W.2d 678 (Tex.Civ.App.—Galveston 1957, writ dism'd).

■ Statutes which have application to remedial and procedural matters are valid and control the litigation from the date they become law. Phil H. Pierce Co. v. Watkins, 263 S.W. 905 (Tex.1924); Bryant v. State, 457 S.W.2d 72 (Tex.Civ.App.—Eastland 1970, writ ref. n. r. e.).

■ Substantive law includes those rules and principles which fix and declare the primary rights of individuals as respects their person and their property, and generally the remedy available in the case of the invasion of those rights. Procedure is the machinery for carrying on a suit, including pleading, process, evidence and practice. Brooks v. Texas Employers Ins. Association, 358 S.W.2d 412 (Tex.Civ.App.—Houston 1962, writ ref. n. r. e.); Haney v. Gartin, 113 S.W. 166 (Tex.Civ.App.1908, writ denied); Jessee v. DeShong, 105 S.W. 1011 (Tex.Civ.App.1907).

Appellee correctly states that the Texas Wrongful Death Statute is wholly a creature of the law, and thus, is an integral part of the substantive law of this state. Marmon v. Mustang Aviation, Inc., 430 S.W.2d 182 (Tex.1968). She contends that the amendment, Article 4675a, supra, materially impairs and diminishes the vested right of the widow of the deceased to recover full legal damages for the wrongful death of her deceased husband. She con-

cludes that the statute must operate prospectively and, therefore, would not apply to an action for wrongful death which had occurred prior to the effective date of the statute. She further submits that the rationale of the Texas Supreme Court in California v. Copes, 155 Tex. 196, 309 S. W.2d 227 (1958), is applicable here. There the Supreme Court was confronted with the question of whether a California statutory lawsuit being brought in Texas was controlled by the California or Texas statutes of limitation. The Supreme Court stated:

"Where the statute creates a right it also incorporates a limitation upon the time within which the suit is to be brought, the limitation qualifies the right so that it becomes a part of the substantive law rather than procedural . . ."

■ The statute in question, relating to admissibility of evidence, is procedural and remedial in nature, and all proceedings taken thereafter in pending litigation were governed thereby. Phil H. Pierce Co. v. Watkins, supra.

■ A right of action given by a statute may be taken away at any time, even after it has accrued and proceedings have been commenced to enforce it. National Carloading Corp. v. Phoenix-El Paso Express, 142 Tex. 141, 176 S.W.2d 564 (1944). If a right of action created by legislative act can be terminated by a repeal of that act after a case has been filed seeking to enforce the rights so created, it would seem plain that the legislature could amend the act creating the right of action to limit the benefits accruing under it as by making admissible testimony which otherwise would not have been admissible.

■ The error of the trial court in refusing to admit the testimony establishing the plaintiff's marital status at the time of the trial does not require a reversal of this case. The plaintiff's damages accrued on the death of her husband. The trial court charged the jury that they could con-

sider "the following elements and none other; care, maintenance, support, services, advice, counsel and contributions of pecuniary value that Sue Brecheen would in reasonable probability have received from William D. Brecheen, Jr. during his lifetime had he lived." The evidence reflects that after the injury of March 10, 1970, Mr. Brecheen was frequently in a state of depression, preferring to be alone, uncommunicative, suspicious of his wife, and that on one occasion he threatened her with a pistol. The record also reflects that during a substantial portion of that time he was unable to work. The jury, however, evidently concluded that except for the injury and resulting mental instability and death the marriage would have continued and Mr. Brecheen would have contributed substantially to his wife in regard to care, maintenance, support, services, advice, and counsel. The evidence concerning the relationship between the plaintiff and her deceased husband prior to the incident resulting in this suit fully supports the finding made by the jury. We cannot say, therefore, that merely because Mrs. Brecheen had remarried and no longer had need for the advice, counsel, services and support of her former husband, they would have reduced the amount of the award. The death statute provides that the jury may give such damages as they think proportionate to the injury resulting from the death. The measure of recovery is the pecuniary loss sustained by reason of the death, that is, the present monetary value of the benefits that the plaintiff had a reasonable expectation of receiving from the deceased, had he not been killed. This includes not only money but everything that can be valued in money. 17 Tex.Jur.2d, Death by Wrongful Act, § 43, p. 586; McGown v. International & G. N. R. Co., 85 Tex. 289, 20 S.W. 80 (1892).

Mr. Brecheen died in December 1972, and his wife remarried in January 1974. We are not prepared to say that had the jury known Mrs. Brecheen had remarried about one year after the death of her hus-

band, it probably would have reduced the amount of damages awarded to her. We cannot say that the error of the trial court was calculated to and probably did cause the rendition of an improper judgment.

■ This conclusion is required by the well established rule in this state that the remarriage of a surviving spouse, or the possibility thereof, does not affect the damages recoverable for the wrongful death of the deceased spouse. As a corollary to this rule (prior to the enactment of Article 4675a, supra), evidence of the surviving spouse's remarriage was not admissible where it was offered only for the purpose of mitigating damages. J. A. Robinson Sons, Inc. v. Ellis, 412 S.W.2d 728 (Tex.Civ.App.—Amarillo 1967, writ ref. n. r. e.). We find two cases in which evidence of remarriage of the surviving spouse was admitted. In each of these cases the trial court instructed the jury that they should not consider, in mitigation of the damages which they might allow to the plaintiff, the fact of her remarriage. Texas Electric Ry. v. Stewart, 217 S.W. 1081 (Tex.Civ.App.—Dallas 1919, writ ref.); Dixie Motor Coach Corp. v. Shivers, 131 S.W.2d 677 (Tex.Civ.App.—Fort Worth 1939, writ dism'd w. o. m.). In the latter case the giving of such instruction was held to be reversible error. In the course of its opinion, however, the court said:

> "Where there is no friction between husband and wife, no facts showing the likelihood of a final, legal separation, and the relationship shows a calm and undisturbed matrimonial sea, there is nothing for the jury to find except the reasonable pecuniary value of these services and contributions, because it must be presumed that the relationship will continue until death, under such natural human relations. But such a picture is not presented to us in the case at bar."

■ We are not convinced that the legislature by the enactment fo Article 4675a, supra, intended to change the established rule for the ascertainment of the damage suffered by the plaintiff in a wrongful death action. Under the evidence in this case the fact of the remarriage of Mrs. Brecheen could not properly have been considered by the jury in mitigation of the damage suffered by her. Railway Co. v. Younger, 90 Tex. 387, 38 S.W. 1121 (1897). We cannot presume that the jury would have been influenced by this evidence in the process of determining the amount of damages, and in the absence of a showing that the jury was unduly influenced by sympathy for a bereaved widow, we are unable to determine that the exclusion of the testimony would have affected the verdict of the jury.

■ The jury found that the appellant failed to make a proper inspection of the rope that it used to tie the spout to the railroad tank car hatch as a person using ordinary care would have done, and that such failure was a proximate cause of the occurrence in question. The appellant contends that the evidence is insufficient to support these findings. There was evidence that Michael Daniello, an employee of Humble Oil & Refining Company, placed the loading chute into the tank car, tied the loose end of the rope to a bolt located on the tank car hatch, the other end of the rope having been previously tied to a hook on the chute. He then tested the strength of the knots by giving the rope "a yank." About thirty minutes later the chute came loose from the tank car hatch and began swinging back and forth, pouring oil over the decedent. It came loose at or near the place where it was tied to the hook on the spout. Mr. Daniello stated that the rope either came loose or broke and that it was his responsibiltiy to properly secure and inspect the rope. Mr. Daniello notified his supervisor, Mr. Ashley, of the accident and Mr. Ashley took Mr. Brecheen to the hospital. When Mr. Ashley returned the rope had been retied so that the loading of the tank car could continue.

Mr. Daniello did not know whether the rope was securely tied prior to the accident and did not make any "exceptional inspection." No one else inspected the rope. He did not know whether the rope broke or whether it merely came loose. He testified that the only way he tested the rope was to yank it. There is no evidence that the rope was subjected to any unusual strain or stress prior to the incident in question. The jury might well have concluded that a proper inspection of the rope would have shown either a weakened condition or a loose knot. The evidence is sufficient to support the jury's findings to the issues in question.

The judgment is affirmed.

EVANS, J., concurring.

EVANS, Justice (concurring).

I concur with the majority opinion and make this brief addendum to voice the view, expressed earlier by Justice Coulson, concurring in Texas Employer's Insurance Association v. Saunders, 516 S.W.2d 242, Tex.Civ.App.—Houston (14th) 1974, that the rule announced in Jones v. Traders & General Insurance Co., supra, should be considered in the light of today's understanding of human behavior.

As distinguished from the factual situation in Jones, there is evidence in this case the Brecheen acted irrationally and "without conscious volition" in taking his own life. A tortious act may produce in a person a depressive state of mind to the degree that the person is unable to perceive with a sense of reality the value of his life to himself and to others. Thus, without rational basis for doing so, he may decide there is no benefit in the continuation of his life and act to destroy himself. In my opinion there was sufficient evidence in this case that Brecheen's state of mind deprived him of his "capacity to govern his conduct in accordance with reason." Restatement of Torts 2d, Section 455(b).